UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                    **REPORT,**
                                             **RECOMMENDATION**
                                             **and ORDER**

v.
                                             14-CR-00160-WMS-JJM-1
RONALD FIX,
                        Defendant.
_____

Defendant Ronald Fix is charged in a two-count Superseding Indictment [27][1]

with conspiracy to traffic in counterfeit goods, in violation of 18 U.S.C. §371, and trafficking in

counterfeit goods, in violation of 21 U.S.C. §2320(a)(1).[2]  Before me are defendant Fix's

motions for a bill of particulars (Housh Affirmation [35], ¶4) and to suppress physical evidence

and statements (id., ¶¶51-54)[3], as well as the government's cross-motion for reciprocal

discovery.  Government's Response [38], §IX, pp. 23-24 of 24.  A suppression hearing was held

on October 29, 2015 [52], at which FBI Special Agent ("SA") Brendan Donlan testified for the

government, and defendant Fix testified on his own behalf.  Thereafter, the parties submitted

post-hearing briefs [56, 60, 63, 64], and oral argument was held on July 27, 2016 [65].  For the

following reasons, defendant Fix's motion for a bill of particulars is denied and the government's

cross-motion for reciprocal discovery is granted.  I further recommend that defendant Fix's

suppression motion be denied.

---

[1]      Bracketed references are to CM/ECF docket entries.

[2]      The Superseding Indictment [27] also contains a forfeiture allegation.

[3]      At the October 1, 2015 proceeding, the parties agreed that all other portions of defendant Fix's
pretrial motion [35] were resolved.  *See* October 1, 2015 Text Order [42].

**BACKGROUND**

Defendant Fix was initially charged, along with his brother Richard Fix, in a Criminal Complaint (13-mj-01102 (JJM)) with trafficking in counterfeit goods, in violation of 18 U.S.C. §2320(a). [1]. The Criminal Complaint was supported by the September 25, 2013 Affidavit of FBI SA Aaron Pinder, which centered on information obtained from a search warrant executed at Richard Fix's residence and interview conducted of defendant Fix at his residence on November 29, 2012. Defendant Fix's motion seeks to suppress the statements and physical evidence obtained from that interview. The following is a summary of the testimony and evidence submitted in connection with the motion.

**Testimony of SA Donlan**

Simultaneous to the execution of the search warrant at Richard Fix's residence, SAs Donlan and James Markovits attempted to interview defendant Fix at his residence at 324 Enchanted Forest Lane in Lancaster, New York, believing that he was potentially engaging in the same criminal activity as his brother. Revised transcript of the October 29, 2015 hearing [52], pp. 5-6, 27, 29, 47. However, SA Donlan testified that it never occurred to him that there could be physical evidence relevant to the investigation at defendant Fix's residence (id., pp. 47-48).

The agents knocked on the door of defendant Fix's residence at approximately 7:00 p.m. (id., pp. 6-7, 33). Both agents were wearing suits and their holstered weapons were not visible (id., p. 8). When defendant Fix answered the door, the agents identified themselves, showed him their credentials, and asked if he would be willing to answer some questions (id., pp. 7, 34). Defendant Fix responded "yes", and invited them inside (id., pp. 7-8, 24, 35). SA Donlan did not interpret that invitation as consent to search defendant Fix's home (id., p. 42).

Defendant Fix did not ask the agents what they wanted to question him about (id., pp. 35-36).  The agents followed defendant Fix to the kitchen table (id., pp. 9, 37, 42).  No security sweep was performed and defendant Fix was not patted down or searched (id., p. 9).  Defendant Fix had a "calm, relaxed, normal demeanor" and was cooperative (id., pp. 8, 12, 36, 44).  The interview, which was conducted in a normal conversational tone, lasted approximately 45-60 minutes (id., pp. 10-12).  Defendant Fix never asked to get up, make a call, or to stop the discussion (id., pp. 11, 13).  SA Donlan testified that they did not threaten, coerce, or make promises to defendant Fix (id., pp. 13-14).  Defendant Fix did not appear to be under the influence of drugs or alcohol (id., p. 12).

The agents began the interview by obtaining background information from defendant Fix about him and his brother (id., pp. 15, 37).  The agents did not tell defendant Fix what they were investigating and he did not ask them why they were there (id., p. 37-39).  After five to 10 minutes of obtaining background information, the questioning turned to the merchandise defendant Fix and his brother sold online (id., pp. 15, 37).  Defendant Fix was not told that a search warrant was being simultaneously executed at his brother's residence (id., pp. 39, 45).  SA Donlan conceded that they did not inform him of the search warrant for fear that he would be less forthcoming (id., pp. 40, 45-46).  Defendant Fix was not Mirandized, since SA Donlan did not believe that he was in custody (id., p. 40).  He was also not asked if he had a lawyer (id., p. 41).  SA Donlan could not recall whether defendant Fix ever attempted to use the telephone (id., p. 41), but acknowledged that they did not tell him that he could use the telephone because they wanted him to continue answering questions (id., p. 43).

Approximately half way through the interview, defendant Fix told the agents that he had a heat press located in his basement, which the agents were unaware of until he

volunteered that information (id., pp. 16, 26, 43, 48).  He also told the agents that he retained some labels and jackets in his basement (id., pp. 16-17, 43).

At the conclusion of the interview, the agents asked defendant Fix whether he would be willing to show them the heating press, labels, and jackets (id., pp. 17-18).  Defendant Fix agreed, and the agents followed him to the basement door (id., p. 17).  Although SA Donlan could not recall who went down the stairs initially, he believed that it was defendant Fix (id., p. 17).  A signed consent to search was not obtained (id., pp. 44-45).

Without conducting a protective sweep of the basement, the agents proceeded directly to the work bench where the heating press was located (id., p. 18). They "only looked in the immediate area of the work bench" (id., p. 26).  At SA Donlan's request, defendant Fix granted the agents permission to take certain jackets (id.).  In addition to the jackets, the agents seized bags of labels hanging from the wall and sitting on a card table (id., p. 19).  A property receipt was signed by defendant Fix for the seized items (id., p. 19; gov. ex. 1 [47-1]).  Defendant Fix told the agents that they could take the heating press, but they declined and instead obtained his permission to photograph it (id., p. 20; gov. exs. 2 and 3 [47-1], pp. 2-3 of 5).  They also photographed some of the labels in the basement without any objection from defendant Fix (id., p. 21; gov. exs. 4 and 5 [47-1], pp. 4-5 of 5).

While the agents were in the basement, defendant Fix never asked them to leave or not to touch anything (id.,  p. 22).  SA Donlan testified that neither he nor SA Markovits threatened defendant Fix while they were in the basement (id., pp. 22-23). The agents did not go anywhere other than the basement, kitchen and front hallway of the residence (id., p. 23).  SA Donlan did not see or hear anyone else in the residence (id., pp. 10, 23, 25, 36-37).

**Testimony of Defendant Fix**

In support of his motion to suppress, defendant Fix submitted an Affidavit

Alleging Standing [35-2] stating, *inter alia*, that:

-- In November 2012 he resided at 150 Suzette Drive in Depew,
New York, and that SA Pinder and others interviewed him at that residence (id., ¶1);

-- The agents "pounded on the door very loudly, as if it was an emergency", and
walked into the house without asking for or him granting them permission to enter (id., ¶¶2-3);

-- During the interview his wife and two daughters were present and were
"extremely intimidated and frightened" (id., ¶5);

-- One of the agents told him "in a sharp voice . . . 'if you're thinking about
calling your brother and warning him, don't bother.  We have someone at his house right now'",
which he interpreted to mean that he could not use his telephone.  If he had not been prevented
from using his telephone, he would have called a lawyer (id., ¶¶6-7); and

-- The agents asked "me if I had a heat press and went to my basement and started
searching without asking me . . . . I saw them looking around all over . . . . [L]aw enforcement
never asked if I consented to a search of any kind" (id., ¶¶8-9).

At the suppression hearing, defendant Fix conceded that his Affidavit mistakenly

provided the wrong address for his residence, explaining that he currently resides at 150 Suzette

Drive in Depew, but resided at 324 Enchanted Forest Lane at the time of the search [52], pp. 50-

51.  He also acknowledged that contrary to what he stated in his Affidavit, neither his wife nor

SA Pinder were present at the time of search (id., pp. 51, 64-67).

Defendant Fix, who was 50 years old at the time of the November 2012

encounter,  testified that his daughters (ages 7 and 11) went to the front door with him in

response to pounding on the door (id., pp. 51-53, 68).  He opened the door, stepped out partially

onto the front porch and asked, "What can I help you with?" (id., p. 54).  When the agents

responded that they wanted to ask him some questions, he asked "what does this pertain to?", but

they just repeated that they wanted to ask him some questions (id.).   After the agents showed

defendant Fix their identification, he believed that it was his duty to answer their questions (id., p. 55).  The agents asked him if they could enter the house and he "propped the door open so they could come in" (id., pp. 55-56).  However, he also testified that he did not remember the agents asking to enter his home and that he did not "specifically grant[ ] them permission to enter . . . it was to answer questions" (id., p. 62).  Although he believed that they were going to ask him questions on the porch and did not invite them into his home, he did not attempt to stop them from entering because he was "trying to be as cooperative as possible" (id., pp. 62-63). Defendant Fix believed that they were going to question him about the theft of items from the school where he and his wife coach basketball (id., p. 56).

Defendant Fix did not initially know whether the agents were armed, but later observed a firearm on one of the agents when they sat down at the kitchen table (id., pp. 56-57). At the kitchen table, the agents proceeded to ask him questions about his brother and also a few questions about his cousin (id., p. 57).  When he asked the agents why they were questioning him, "[t]hey just said they wanted to know" (id.).   Defendant Fix did not feel that he could refuse to answer their questions, since he believed that it was his "obligation to answer their questions because they're FBI agents" (id., p. 58).  However, somewhat contradictorily, he also testified that if they told him that he was the subject of an investigation, he would have asked them to leave (id.).

During the course of the interview, they asked defendant Fix if he had a heat press and where it was located (id., p. 59).  When defendant Fix told them that it was in the basement, they asked if they could see it, and he told them "yes, they could see it" (id.).  They then walked downstairs to the basement and he showed it to them (id., p. 60).  Although he claims he never gave the agents permission to search his basement or to seize items, one agent proceeded to walk

through the rest of the basement and look through his laundry without asking for permission (id., pp. 60, 63).  Upon discovering a jacket, that agent brought it over and showed it to the other agent (id., pp. 60-61).  The agents then started to look at some of the labels, took photographs, and began to ask defendant Fix about them (id., p. 61).   Defendant Fix continued to believe that he could not refuse to answer their questions, and "was trying to be as cooperative as possible" when they asked him about the items they discovered in his basement (id.).  The agents took some items with them, and asked him if he would sign off that they were taking them (id.).  He signed the receipt, but did not understand that it was memorializing his consent to search the basement (id.).

Defendant Fix's daughters remained huddled in the living room during the encounter because they were initially very frightened due to the pounding at the front door (id., p. 63).  Defendant Fix acknowledged that he never asked the agents to leave, to cease their questioning, or for a lawyer (id., p. 70).  The agents also never told him that it was his duty to cooperate (id., p. 71).  He also conceded that the agents did not go anywhere in his residence except for the foyer, kitchen and basement (id.).

## ANALYSIS

**A.    Defendant Fix's Pretrial Motions**

**1.    Motions to Suppress**

Since the version of events given by SA Donlan and defendant Fix differ in certain material respects, "this case turns, as many do, on the issue of credibility".  United States v. Bayless, 921 F.Supp. 211, 213 (S.D.N.Y. 1996).  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the

judge is 'entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness.'" Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony". Diallo v. I.N.S., 232 F.3d 279, 287 88 (2d Cir. 2000).

Having personally observed the witnesses and considered their demeanor, I credit the testimony of SA Donlan over that of defendant Fix. In particular, I am influenced by defendant Fix's admission that several statements in his sworn Affidavit were not true. Further eroding his credibility, defendant Fix stated in his sworn Affidavit that the agents asked "me if I had a heat press and went to my basement and started searching *without asking me*" ([35-2], ¶8 (emphasis added)), but later testified that the agents "*asked* if they could see [the heat press]", and he told them "yes, they could see it". [52], p. 59 (emphasis added). This material inconsistency and the admittedly false statements in his sworn Affidavit are sufficient to render the entirety of his testimony suspect. *See* United States v. Weinstein, 452 F.2d 704, 713 (2d Cir. 1971) ("Such disregard of his oath is enough to . . . make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements"); United States v. Schenck, 1994 WL 55765, *4 (W.D.N.Y.1994) (Skretny, J.) ("the Court finds that Paul Schenck made false statements under affirmation concerning a material matter . . . and that his entire testimony is therefore suspect").

### a.    Suppression of Physical Evidence

As conceded by the government, it bears the burden of proving, by a preponderance of the evidence, that defendant Fix's consent to search was voluntary.

Government's Post-Hearing Memorandum of Law [56], p. 19.  "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'"  United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004).  "Consent must be a product of that individual's free and unconstrained choice . . .  rather than a mere acquiescence in a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993)  Law enforcement must have "a reasonable basis for believing that there has been consent to the search". Isiofia, 370 F.3d at 231.

Considering the totality of the circumstances, I conclude that defendant Fix voluntarily consented to the search.  The credible testimony establishes that defendant Fix's consent was not the product of threats, coercion or promises.  Even crediting defendant Fix's sworn statement that one of the agents cautioned him about calling his brother ([35-2], ¶¶6-7), "this denial of the call to the brother did not vitiate or undermine what was clearly a voluntary consent".  United States v. Schaefer, 859 F. Supp. 2d 397, 409 (E.D.N.Y. 2012), aff'd, 519 Fed. App'x 71 (2d Cir. 2013) (Summary Order).  Although defendant Fix was not advised of the right to refuse consent, "the government need not establish such knowledge as the *sine qua non* of an effective consent".  Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

The credible testimony also establishes that when asked if he would be willing to show the agents the heating press, labels and jackets, he said yes and led the agents to the basement door.  [52], p. 17.  Under these circumstances, a reasonable person would have believed that defendant Fix consented to the agents entry into his basement and inspection of these items.  *See* United States v. Sorcher,  2007 WL 1160099,  *6 (E.D.N.Y.  2007) ("a reasonable person in Sheedy's position would  . . .  have believed that Sorcher consented to her presence at the school and her review of those documents that he freely relinquished to her").

While defendant Fix did not execute a written consent to search or expressly recite that he was granting them permission to enter the basement to inspect the items, "it is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981). [4] Though defendant Fix speculates that it is "telling that no [consent to search form]" , which "presumably would have been at hand", was used by the agents (defendant Fix's Post-Hearing Memorandum of Law [60], pp. 4-5 of 8), the absence of a written consent does not render SA Donlan's version of events less credible. See United States v. Harper, 787 F.3d 910, 914 (8th Cir. 2015) ("Harper notes that no officers could corroborate Detective Monson's claim that he asked for and obtained consent from Harper [and] . . . . that the lack of forms did not preclude Detective Monson from obtaining or memorializing consent on any available paper. Harper is correct to the extent he argues any or all of these factors might have given the district court reason to believe Harper rather than Detective Monson. None of them, however, create the internal inconsistency or implausibility necessary to compel the conclusion that Detective Monson was non-credible").

Defendant Fix next argues that although SA Donlan acknowledged that he did not interpret defendant Fix's initial invitation to enter his home as a consent to search ([52], p.

---

[4]      Defendant Fix does not argue that the agents exceeded the scope of any consent to search that he may have given. Even if he had raised that argument, it is unpersuasive. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object." Id. There is also no evidence that the agents exceeded the scope of defendant Fix's consent to search, the object of which was the heating press, labels and jackets contained in the basement of the residence. As SA Donlan credibly testified, the agents proceeded directly to the work bench where the heating press was located ([52], p. 18) and "only looked in the immediate area of the work bench" (id., p. 26).

42), "he and Agent Markovits did just that". Defendant Fix's Post-hearing Memorandum of Law [60], pp. 3-4 of 8. That argument misconstrues the operative consent, which was not defendant Fix's invitation to the agents to enter his home to be interviewed, but rather his agreement during their questioning to show them the heating press and other items in his basement.

Finally, defendant Fix argues that "he perceived a powerful civic duty to cooperate at all times with law enforcement". Id. at p. 5 of 8. That may be so, but such a mistaken belief as to his obligation to comply with the agents' request does not render the consent involuntary, especially since the credible testimony establishes that the agents did nothing to foster that belief. See United States v. Biggs, 491 F.3d 616, 623 (7th Cir. 2007) ("in the totality of the circumstances, Biggs's mistaken belief that he would be released if he turned over guns does not render his consent involuntary"); United States v. Gonzales, 1995 WL 628131, *13 (D. Del. 1995) ("Ms. Villazone's mistaken belief as to her right to refuse consent . . . does not render the consent involuntary"). Therefore, I recommend that this portion of defendant Fix's motion be denied.

### b.    Suppression of Statements

Although the suppression hearing also addressed defendant Fix's pretrial motion to suppress his November 29, 2012 statements (Housh Affirmation [35], ¶¶52-54; October 1, 2015 Text Order [42]), at oral argument he withdrew this portion of his motion.

### 2.    Motion for a Bill of Particulars

Fed. R. Crim. P. ("Rule") 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of

double jeopardy should he be prosecuted a second time for the same offense". United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). "[T]he burden is upon defendants to show that non-disclosure of the requested particulars would lead to prejudicial surprise at trial or would adversely affect defendants' rights". United States v. Duarte, 2014 WL 29366, *1 (W.D.N.Y. 2014) (Scott, M.J.).

   "In deciding a motion for a bill of particulars, the important question is whether the information sought is necessary, not whether it is helpful." United States v. Conley, 2002 WL 252766, *4 (S.D.N.Y. 2002). A bill of particulars "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense". United States v. Henry, 861 F.Supp. 1190, 1197 (S.D.N.Y. 1994).

   The court "has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form". United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998). See United States v. Messina, 2012 WL 463973, *10 (E.D.N.Y. 2012) ("In determining whether a defendant has shown such necessity, the trial court must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery"). "Whether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

   With this standard in mind, I will address defendant Fix's request for particularization. For Count 1 of the Superseding Indictment charging defendant Fix with conspiracy to traffic in counterfeit goods, he seeks the following particularization:

"a)     Identify the name of all individuals to whom the
Government alleges Defendant conspired to distribute
counterfeit goods;

b)      The exact, individualized item and description of
counterfeit goods alleged to be in possession of
Defendant . . . during the alleged conspiracy;

c)      State the exact number of times Defendant allegedly
distributed counterfeit goods during the alleged conspiracy;

d)      State the individual(s) with whom [defendant] allegedly
conspired to traffic in counterfeit goods.

e)      State the date of the earliest statement and/or event upon
which the prosecution will rely to prove that the conspiracy
existed;

f)      State the nature of any and all statements and/or events,
other than those already contained in the indictment, upon
which the prosecution intends to rely to prove that the
conspiracy existed;

g)      State the date and nature of the earliest statement and/or
event upon which the prosecution will rely to establish
when each defendant joined the conspiracy;

h)      State the date and nature of the earliest statement and/or
event upon which the prosecution will rely to establish
when [defendant] joined the conspiracy."  Housh
Affirmation [35], pp. 4-5 of 24.

Although "there is a special concern for particularization in conspiracy

cases", United States v. Palmer, 2012 WL 2953659, *3 (W.D.N.Y. 2012) (Scott, M.J.) (*citing*

United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988)),  "a bill of particulars or other adequate

disclosure is appropriate where a conspiracy count covers a complex series of events over a

number of years, but provides only the bare bones of the charge".  Barnes, 158 F.3d at 666.  As

the government argues, "[t]he criminal complaint and supporting affidavit as well as the

superseding indictment provide the defendant with sufficient details so as not to be surprised at

trial".  Government's Response [38], p. 6.  Far from being bare bones, the Superseding

Indictment identifies the manners and means of the alleged two-year long conspiracy and

identifies a series of alleged overt acts taken in furtherance of that conspiracy.  Defendant Fix

also offers no specific facts, reasons, or legal authority to justify the particularization he seeks.

*See* Government's Response [38], p. 6.  Therefore, I conclude that defendant Fix has not

established his entitlement to particularization of Count 1.

With respect to Count 2 of the Superseding Indictment charging defendant Fix

with trafficking in counterfeit goods "[b]etween in or about April 2011 to November 30, 2011, in

the Western District of New York, and elsewhere", he seeks the following particularization:

"a)     Identify the name of all individuals to whom the
        Government alleges Defendant trafficked counterfeit
        goods;

b)      The exact, individualized item and description of
        counterfeit goods alleged to have been trafficked;

c)      State the exact number of times Defendant trafficked
        counterfeit goods [; and

d)      State the individual(s), if any, with whom [defendant]
        allegedly trafficked in counterfeit goods."  Housh
        Affirmation [35], p. 5 of 24.

Likewise, defendant Fix provides no argument or legal authority as to why he is

entitled to particularization of Count 2 of the Superseding Indictment. Nor do I see any reason

why particularization is warranted, since both the Introductory section of the Superseding

Indictment and the Affidavit of  SA Pinder submitted in support of the September 25, 2013

Criminal Complaint [1], provide ample detail of the allegations against him.  Therefore,

defendant Fix's motion is denied.

**B.      Government's Cross-Motion for Reciprocal Discovery**

The government moves for reciprocal discovery pursuant to Rule 16(b).

Government's Response [38], pp. §IX, pp. 23-24 of 24.  Defendant Fix has not opposed this

request.  Therefore, the government's motion is granted. "Defendant shall provide such

discovery, if any, not later than 30 days prior to trial or such other date as the District Judge may

direct."  United States v. Sikut, 488 F.Supp.2d 291, 304-05 (W.D.N.Y. 2007) (Foschio,

M.J./Arcara, J.).


**CONCLUSION**

For these reasons, defendant Fix's motion for a bill of particulars (Housh

Declaration [35], ¶4) is denied and the government's cross-motion for reciprocal discovery

(government's Response [38], §IX, pp. 23-24 of 24) is granted; and I further recommend that

defendant Fix's motion to suppress physical evidence and statements (Housh Declaration [35],

¶¶51-54) be denied.

Unless otherwise ordered by Judge Skretny, any objections to this Report,

Recommendation and Order must be filed with the clerk of this court by August 22, 2016

(applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests

for extension of this deadline must be made to Judge Skretny.  A party who "fails to object

timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair

Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance.  <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.


Dated:  August 4, 2016

                                        /s/ Jeremiah J. McCarthy
                                        JEREMIAH J. MCCARTHY
                                        United States Magistrate Judge